**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **GINA R. LATTARULO,** | |
| **Plaintiff,** | **No. 13 C 6714** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gina Lattarulo filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 1381 et seq. The parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A

---

[1] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI DIB is virtually identical to that

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI benefits on August 4, 2010, alleging she became disabled on August 12, 2008, because of bipolar disorder, anxiety, obsessive compulsive disorder, neck and lower back injuries, arthritis, carpal tunnel in both wrists, hepatitis C, and back pain. (R. at 13, 67). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 13, 61–67, 79–82, 84–87). On January 30, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 13, 34–59). The ALJ also heard testimony from Christine Ernst, Plaintiff's caseworker. (*Id.* at 13, 58–59). After the hearing, the ALJ held the record open to submit vocational interrogatories to Timothy N. Tansey, a vocational expert (VE). (*Id.* at 13). After taking Plaintiff's responses to the initial interrogatories back to the VE for consideration, the VE's updated responses were sent back to the Plaintiff and the ALJ closed the record. (*Id.*).

The ALJ denied Plaintiff's request for benefits on April 27, 2012. (R. at 13–26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since August 4, 2010, the application date. (*Id.* at 15). At step two, the ALJ found that Plaintiff's anxiety disorder, bipolar disorder, and history of back pain are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 16).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform medium work as defined in 20 C.F.R. § 416.967(c) except that:

> [Plaintiff] may only frequently stoop, crouch, crawl, and climb ladders, ropes, and scaffolds. However, her ability to balance, kneel, and climb ramps and stairs are not restricted. Due to [Plaintiff's] mental impairments, she can only understand, and carry out simple, routine repetitive, one to four step work tasks. [Plaintiff's] work must only allow for superficial contact with the general public that is nonconfrontational in nature.

(R. at 17). At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (*Id.* at 24). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including sewing machine operator, mail clerk, and assembler. (*Id.* at 25). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on July 23, 2013. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

On November 13, 2009, Plaintiff sought treatment with Metropolitan Family Services. (R. at 319–22). Alex Godinez, M.A.,[3] diagnosed major depressive disorder and anxiety disorder and assigned a Global Assessment of Functioning (GAF) score of 44.[4] (*Id.* at 319, 321). On March 9, 2010, Plaintiff treated with Badar Zaheer, M.D., who diagnosed bipolar disorder and confirmed a previous hepatitis C diagnosis. (*Id.* at 324).

---

[3] Master of Arts in Counseling.

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) (hereinafter *DSM-IV*). A GAF score of 41–50 correlates with "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 32. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see also Williams v. Colvin,* 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

Near the end of April 2010, Plaintiff sought treatment with the DuPage County Health Department. (R. 361–85). She reported auditory hallucinations and problems with her bipolar medications. (*Id.* at 369). Celina Mendez, a Licensed Professional Clinical Counselor (LCPC), concluded that Plaintiff's quality of mood and affect were both abnormal, her problem solving was impaired, and she was inattentive. (*Id.* at 366, 368). Mendez assigned a GAF score of 41–50. (*Id.* at 369).

Plaintiff returned to DuPage on May 3, 2010, seeking treatment with her primary treating psychiatrist, Sanjeev Dwivedi, M.D. Plaintiff reported that she would be homeless by that Saturday, having just ended her relationship. (R. at 398). Dr. Dwivedi found that Plaintiff's mood and affect were abnormal, her judgment and problem solving were impaired, and she had problems adhering to treatment compliance in terms of taking her medications. (*Id.* at 401–06). Plaintiff was again assessed with a GAF score of 41–50. (*Id.* at 406).

On September 10, 2010, Plaintiff returned to the DuPage County Health Department. She had a relapse of symptoms from not taking her prescribed medication. (R. 356–85). Plaintiff's GAF score was again assessed in the range of 41–50. (*Id.* at 359).

Plaintiff's mother filled out a third party function report on September 15, 2010. (R. at 205–214). She observed that Plaintiff hears voices, wanders away, has unstable mood swings, and is impulsive and irrational. (*Id.* at 207). Her mother also noted that Plaintiff needs reminders to take her medication and even to bathe. (*Id.* at

208–09). Finally, Plaintiff's mother reported that Plaintiff is "unable to maintain focus without outbursts." (*Id.* at 211).

About a week later, on September 21, 2010, Mendez concluded that Plaintiff had problems following up with appointments and taking her medication regularly due in part to her homelessness. (R. at 412). Mendez also noted that Plaintiff's dosage of Seroquel had been increased several times over the previous month. (*Id.* at 414).

On October 18, 2010, Plaintiff returned to DuPage County Health Department for a psychiatric evaluation. Dr. Dwivedi noted that, despite Plaintiff being sad from the death of her friend, she was doing well on her medication and appeared stable. (R. at 417). Plaintiff's mood and affect remained abnormal but her judgment and problem solving were noted as "intact." (*Id.* at 418–19). Plaintiff was again assessed a GAF score of 41–50. (*Id.* at 420).

On November 13, 2010, Joseph Martin Nemeth, M.D, performed a psychiatric consultative examination on behalf of the Commissioner. (R. at 529–30). Plaintiff reported taking Xanax, Seroquel, Hydrocodone, Tramadol, and Cyclobenzaprine. (*Id.* at 529). Plaintiff was unkempt, cried throughout the interview, and admitted to having "mood swings, periods of irritability, anger, depression, and auditory hallucinations—hearing a voice, possibly that of her dead father." (*Id.* at 530). Dr. Nemeth diagnosed bipolar I disorder with psychotic features, anxiety disorder, and obsessive-compulsive disorder. (*Id.* at 530). He opined that Plaintiff appeared incapable of handling her own funds. (*Id.*).

Plaintiff returned to DuPage on January 7, 2011. On examination, her judgment and problem solving were impaired, her mood normal. (R. at 591–92). Plaintiff stated she had been off Seroquel for two weeks and had self-medicated with her sister's Xanax, which appeared to reduce her symptoms. (*Id.* at 590). Plaintiff was assessed a GAF score of 41–50 and diagnosed with bipolar 1 disorder. (*Id.* at 593).

On July 1, 2011, Plaintiff sought treatment at Transitional Services Center (TSC). A mental health assessment was conducted by Celina Mendez, LCPC.[5] (R. at 600–12). In addition to being depressed, Plaintiff's thought process was abnormal and her cognition and memory were impaired. (*Id.*). Mendez opined that Plaintiff needs to develop skills to take her medications, including Tramadol and Hydrocodone, on a consistent basis. (*Id.* at 607, 611). Plaintiff's GAF score was assessed at 50, and she was diagnosed with bipolar I disorder. (*Id.* at 610). Mendez also conducted a Level of Care Utilization System (LOCUS) assessment, which found that Plaintiff, "has not achieved complete remission of symptoms or optimal control of symptoms" and recommended a high intensity level of care. (*Id.* at 621–22).

Ten days later, on July 11, 2011, Plaintiff returned to TSC claiming she wanted to get back "on meds." (R. at 617). Jinger Hoop, M.D., conducted a full psychiatric evaluation. (*Id.* at 617–21). Plaintiff reported hearing voices on occasion. (*Id.* at 618). He found Plaintiff to be anxious and depressed, her thought content and mood abnormal, and her affect blunted. (*Id.*). Dr. Hoop diagnosed bipolar disorder NOS

---

[5] The Court can only assume that Mendez worked for both the DuPage County Health Department and Transitional Services Center during this time, or changed positions during the course of Plaintiff's treatment, as she is providing counseling services for Plaintiff at two locations.

and assessed Plaintiff's GAF score at 45. (*Id.* at 619–20). He opined that Plaintiff's housing and economic problems severely impacted her mental health. (*Id.* at 620). Dr. Hoop discontinued Seroquel, prescribed Lithium and Trazadone, and scheduled her for weekly psychotherapy. (*Id.*).

On August 8, 2011, Plaintiff complained of worsening depression and occasional crying spells. (R. 613). Dr. Hoop opined that Plaintiff has "serious" mental illness and requires care to maintain stability. (*Id.* at 616). He diagnosed bipolar disorder NOS, with multiple psychosocial and environmental stressors, and assessed her GAF score at 45. (*Id.* at 613, 615). Dr. Hoop increased Plaintiff's Lithium dosage to 900mg and started her on Ritalin because of documented ADD. (*Id.* at 616).

On December 22, 2011, Plaintiff reported feeling anxious and irritable. (R. at 649). Dr. Hoop opined that Plaintiff "has chronic and persistent mental illness and requires ongoing care for stabilization and continued functioning." (*Id.* at 652). He diagnosed bipolar disorder NOS, obsessive-compulsive disorder and assessed her GAF at 45. (*Id.* at 651). He increased Plaintiff's lithium dosage and considered increasing Prozac to target her OCD symptoms, but decided against it because of concerns over "manic switching." (*Id.* at 652).

On January 5, 2012, Plaintiff was placed into the mental health and substance abuse (MISA) Program with Christine Ernst, MHP. (R. at 624). The goal of the MISA Program is to "[d]evelop an increased understanding of severe and persistent mental illness symptoms, as well as an understanding of the indicators of and the triggers for decompensation." (*Id.* at 625). The MISA Program staff noted that

Plaintiff has a history of poor medication compliance. (*See, e.g.*, January 13, 2012 (*id.* at 638); January 18, 2012 (*id.* at 642)).

## V. DISCUSSION

Plaintiff raises a number of arguments in support of her request for a reversal and remand. Her principal arguments can be summarized as: (1) the ALJ's step three determination was erroneous; (2) the ALJ's credibility determination was patently wrong; and (3) the ALJ's RFC determination did not properly account for the combined effects of Plaintiff's impairments. The Court addresses each argument in turn.

### A. The ALJ Conducted a Proper Step-Three Analysis

The ALJ determined at step three that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. at 16–17); *see* 20 C.F.R. pt. 404, subpt. P., app. 1. Plaintiff alleges that the ALJ's step-three analysis was erroneous because the ALJ did not utilize the special technique required for assessing mental illnesses as required by 20 C.F.R. § 416.920a(b). (Mot. 7). Additionally, Plaintiff alleges that the ALJ did not document medical signs or laboratory findings which substantiated the presence of a mental disorder in accordance with the "A" criteria of the listings set out in 20 C.F.R. § 416.920a(e)(4) and instead only focused on the "B" criteria of the listings. (*Id.* 7–8). While Plaintiff does not make clear which listing under the "A criteria" she meets, each of the § 12.00 listings require a satisfaction of the require-

ments in both "A criteria" and "B criteria." 20 C.F.R., pt. 404, subpt. P, app.1, § 12.00 et. seq.

In this instance, the ALJ's step-three analysis concluded that Plaintiff failed to satisfy the "B criteria" because her mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. (R. at 16). Plaintiff would not have qualified for these listings regardless of her satisfaction of the "A criteria." Therefore, the ALJ's failure to discuss the "A criteria" was not in error. *See Smith v. Colvin*, 931 F. Supp. 2d 890, 900 (N.D. Ill. 2013) (Since claimant "failed to satisfy criterion B," she "could not have qualified for Listing 12.04 regardless of whether or not she satisfied criterion A, so the ALJ's failure to discuss that criterion was not an error."); *Flynn v. Astrue*, 563 F. Supp. 2d 932, 941 (N.D. Ill. 2008) ("Since the ALJ found [claimant's] impairment failed to meet section B, his failure to discuss section A was meaningless.").

## B. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see*

*Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

On September 15, 2010, Plaintiff's mother completed a Function Report. (R. at 207–14). Patti Stickler reported that her daughter hears voices, wanders away, has unstable mood swings, and is impulsive and irrational. (*Id.* at 207). Plaintiff also

has difficulty managing her personal care without constant reminders. (*Id.* at 208–09). Plaintiff is able to use public transportation but is too mentally unstable to drive a car. (*Id.* at 210). Stickler opined that Plaintiff is too forgetful and irresponsible to handle money. (*Id.*). Plaintiff has difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (*Id.* at 212). Stickler reported that Plaintiff does not handle stress or changes in routine. (*Id.* at 213).

On September 16, 2010, Plaintiff completed a Function Report. (R. at 229–39). She reported difficulty focusing, concentrating, and remembering. (*Id.* at 229). She is careless, hears voices, has verbal outbursts, and frequently cries. (*Id.*). Plaintiff stated she cannot sleep without her medication and has frequent nightmares. (*Id.* at 230). She needs reminders to care for herself and take her medications. (*Id.* at 230–31). She explained that a lot of her daily activities are taken care of by the shelter where she resides. (*Id.* at 230–32). Plaintiff reported violent outbursts and other antisocial behaviors. (*Id.* at 234). She has trouble with her memory, completing tasks, concentrating and getting along with others. (*Id.*).

On May 4, 2011, Plaintiff completed a second Function Report. (R. at 253–63). She stated that she cannot sit still long enough to finish activities, has trouble with her memory, and hears voices. (*Id.* at 253). She has violent outbursts, is easily confused, and has frequent crying spells. (*Id.*).

Plaintiff testified that she is unable to work because she has trouble concentrating and is forgetful. (R. at 38, 56). Her bipolar disorder causes periodic manic at-

tacks, anxiety, and mood swings. (*Id.* at 40, 43). She has been unable to get consistent therapy because of her homelessness. (*Id.* at 43). Plaintiff is feeling better now that she is in a residential treatment home. (*Id.* at 44). Her caseworker at the treatment center ensures that she is compliant with her medications. (*Id.* at 53).

In her decision, the ALJ found Plaintiff's not credible to the extent that they were inconsistent with the RFC:

> As a whole, [Plaintiff's] allegations concerning her activities of daily living tended to indicate the symptoms of her mental and physical impairments are not as severe as alleged. [Plaintiff] is capable of performing numerous activities of daily living on a regular and routine basis and she is able to leave the home and interact with the general public on at least a superficial level. . . .
>
> After examining [Plaintiff's] testimony in light of the objective medical evidence of the record, the undersigned noted the frequency and type of treatment [Plaintiff] received was generally inconsistent with her allegations of limited functioning. [Plaintiff's] treatment was generally sparse and generally documented prolonged gaps where [Plaintiff] was noncompliant with her prescription medication. [Plaintiff's] representative primarily attributed [Plaintiff's] limited treatment to her lack of finances and homelessness. However, the undersigned noted that when [Plaintiff] did received [*sic*] treatment, it was generally conservative and routine and that the objective finding from her mental status examinations tended to remain normal once she continued taking her prescription medications. The undersigned also noted [Plaintiff's] GAF scores were continually in the range of 40–50, which her representative argued documented serious limitations in her functioning. However, the undersigned noted [Plaintiff's] GAF score did not tend to fluctuate with her reported improvement on medication and remained at the same level for the duration of her treatment records. The unchanging nature of [Plaintiff's] GAF scores suggested her therapists at DuPage either failed to reassess her score or factored her homelessness heavily into the computation of the overall score. As a result, the undersigned gave it limited weight when determining the overall severity of [Plaintiff's] mental impairments.

(R. at 22).

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, Plaintiff's allegations of limited functioning are supported by the medical record. She was consistently diagnosed with serious mental disorders. (R. at 321 (major depressive disorder and anxiety disorder), 324 (bipolar disorder), 530 (bipolar disorder with psychotic features, anxiety disorder, and obsessive-compulsive disorder), 593 (bipolar disorder), 610 (same), 615 (same), 651 (bipolar disorder and obsessive-compulsive disorder)). Bipolar disorder "causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression). . . . Mood shifts may occur only a few times a year or as often as several times a week." <http://www.mayoclinic.org> "Psychotic features are often present during the manic phase [but] may also manifest during extreme episodes of depression. . . . These features include delusions (false ideas about what is taking place or who one is) and hallucinations (seeing or hearing things which aren't there)." <http://psychcentral.com/lib/bipolar-disorder-with-psychotic-features/> Plaintiff's treating physicians frequently noted impaired functioning. (*Id.* at 369 (abnormal mood and affect, inattentive, impaired problem solving, auditory hallucinations), 401–06 (abnormal mood and affect, impaired judgment and problem solving), 418–19 (abnormal mood and affect), 530 (unkempt, crying, mood swings, irritable, angry, auditory hallucinations), 591–92 (impaired judgment and problem solving), 600–12 (abnormal thought process, impaired cognition and memory), 620 (impaired functioning), 613–16 (unstable), 652 (irritability)). The ALJ cannot discuss only those

portions of the record that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). "Moreover, the ALJ's analysis reveals an all-too-common misunderstanding of mental illness." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Indeed, the very nature of bipolar disorder is that patients with the disorder experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a "good day" does not imply that the condition has been treated. *Id.*; *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

Second, a bipolar patient's noncompliance with medication and treatment does not adversely affect a determination of credibility. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."). "Changes in medication, or sporadic compliance with a prescribed treatment, is not necessarily a sign that a claimant is not credible." *Barnes v. Colvin*, — F. Supp. 3d —, No. 13 C 3850, 2015 WL 764107, at *4 (N.D. Ill. Feb. 23, 2015). That is because "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011); *see also Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (noting that bipolar disorder may prevent a claimant "from taking her prescribed medicines or otherwise submitting to treatment"); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) (relying on a failure

to take medications "ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications"). Here, none of Plaintiff's treating physicians opined that noncompliance with treatment or medications meant that her symptoms were less serious than she alleged. "The ALJ was required to consider the relation between [Plaintiff's] illness and [her] behavior more carefully before concluding that [her] actions undermined [her] credibility." *Barnes*, 2015 WL 764107, at *4.

Third, Plaintiff's activities of daily living do not necessarily translate into an ability to work full time. While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio*, 630 F.3d at 712 ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). And here, Plaintiff's ability to function in the highly regimented life at the residential treatment home does not mean that she would be able to function in a demanding workplace environment.

Finally, the ALJ erroneously concluded that the "unchanging nature of [Plaintiff's] GAF scores suggested her therapists at DuPage either failed to reassess her score or factored her homelessness heavily into the computation of the overall

score." While the American Psychiatric Association no longer uses the GAF metric, *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the individual's overall level of functioning," *DSM–IV* at 32. Here, Plaintiff's GAF scores of 41–50 indicate "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM IV* at 32. It is true that GAF scores are not dispositive of Plaintiff's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the GAF score does not necessarily reflect doctor's opinion of functional capacity because the score measures severity of both symptoms and functional level). Nevertheless, Plaintiff's GAF scores are evidence suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014) (Although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."). Moreover, the ALJ provides no medical support for her conclusion that Plaintiff's therapists miscalculated the GAF scores by giving too much weight to her homelessness. *See Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir.1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

## C. Summary

Because the Court is remanding on the credibility issue, the Court chooses not to address Plaintiff's argument that the ALJ erred in her RFC determination. In sum, the Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. The ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele,* 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's finding and providing meaningful judicial review. *See Scott,* 297 F.3d at 595. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's mental impairments and RFC, considering all of the evidence of the record, including Plaintiff's testimony and mental evaluations subsequent to those conducted by Dr. Dwivedi, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **GRANTED**, and Defendant's Motion for Summary Judgment [21] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: July 7, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge